**REL–REEVES, INC., Successor to Dynamics Corporation of America**

v.

**The UNITED STATES, Digital Resources, Inc., and Electronic Associates, Inc., Third-Party Defendants.**

No. 258–67.

United States Court of Claims.

July 18, 1979.

See also 209 Ct.Cl. 595, 534 F.2d 274.

Thomas P. Dowling, New York City, attorney of record, for plaintiff. Kurt E. Richter, Janet Dore, Morgan, Finnegan, Pine, Foley & Lee, New York City, and Finnegan, Henderson, Farabow & Garrett, Washington, D. C., of counsel.

William O. Geny, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; Vito J. DiPietro, Washington, D. C., of counsel.

William L. LaFuze, Houston, Tex., for Digital Resources, Inc., and Steven H. Bazerman, New York City, for Electronic Associates, Inc.

Before NICHOLS, KUNZIG and BENNETT, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on defendant's request, filed January 12, 1979, for review by the court of the recommended decision of Trial Judge Joseph V. Colaianni, filed November 20, 1978, pursuant to Rule 54, on defendant's motion and plaintiff's cross-motion for summary judgment, having been submitted to the court on the briefs and oral argument of counsel for the defendant and the plaintiff. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the recommended decision as the basis for its judgment in this case. Accordingly, it is found and concluded that the September 25, 1974 assignment by Rel-Reeves to Dynamics Corporation of America is valid against the Government notwithstanding the Assignment of Claims Act and that DCA is the owner of the patent in suit. Therefore, defendant's motion for summary judgment is denied, plaintiff's cross-motion under Rule 66(c) is granted and the case is remanded to the trial judge for further appropriate proceedings.

## OPINION OF TRIAL JUDGE

COLAIANNI, *Trial Judge:* On March 1, 1978, defendant filed a motion under Rule 41 to give notice to Dynamics Corporation

of America (DCA) and Douglass E. Wendel, trustee for plaintiff, an adjudicated bankrupt. The motion was allowed without opposition on March 20, 1978. On the next day, DCA, the predecessor plaintiff to Rel-Reeves, Inc., filed a motion to respond to defendant's motion under Rule 41 out of time and also filed therewith a cross-motion seeking to be substituted under Rule 66(c) as the plaintiff in place of Rel-Reeves. Defendant filed its response to DCA's cross-motion on March 28, 1978. The Rule 66(c) issue was, with the filing of defendant's June 23, 1978 response, ready for consideration. However, concurrent with its response, defendant filed a motion for summary judgment. By a September 12, 1978 order of the court, defendant's motion for summary judgment was referred, under Rules 54 and 55, to me for a decision and recommendation in connection with matters pending before me under Rules 66(c) and 131(c).[1]

Defendant's motion for summary judgment argues that DCA lacks any valid and enforceable right to recover against the United States because: (1) its right to recover is barred by the Assignment of Claims Act, 31 U.S.C. § 203; and (2) it lacks title to the patent in suit and is not the real party in interest.

In an April 14, 1976 decision,[2] this court entered judgment in favor of plaintiff Rel-Reeves on the issue of liability and remanded the case to the Trial Division to establish the amount of recovery under Rule 131(c)(2).

Since the aforesaid decision, defendant claims to have learned for the first time of DCA's alleged interest in this suit. Defendant filed the previously mentioned motion under Rule 41, to issue notice to both Mr. Wendel, trustee in bankruptcy for Rel-Reeves, and DCA.

DCA opposes defendant's motion to notice the trustee of Rel-Reeves on the ground that it is and has been the owner of the McCoy patent since September 25, 1974 and that neither Rel-Reeves nor the trustee, Douglass E. Wendel, has any interest in this cause of action. DCA also opposed the issuance by the court of notice to it under Rule 41 and instead urges, by virtue of the September 25, 1974 assignment, that it is the proper party-plaintiff and should accordingly be substituted in place of Rel-Reeves pursuant to Rule 66(c).

Defendant acknowledges, on page 3 of its motion for summary judgment, that the substance of its motion and brief for summary judgment is identical to its response to plaintiff's brief in support of its motion under Rule 66(c). Therefore, defendant's motion for summary judgment and plaintiff's motion to be substituted as plaintiff in place of Rel-Reeves will both be considered.

### Background Facts

The facts, which are not in dispute, are set forth in order to provide the necessary background to understand the legal issues raised by the parties.

As of the close of the liability trial in May 1972, DCA was the original and only plaintiff. It owned the entire right, title and interest in and to the McCoy patent and causes of action accruing thereunder. During the next few months, DCA sustained a series of financial reversals and on August 2, 1972, filed a petition to effect an arrangement with its creditors pursuant to the provisions of Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701, et seq., in the United States District Court for the Southern District of New York. Pursuant to an order of that court, DCA, the debtor, was authorized to operate its business and man-

---

1. The questions raised by defendant's motion for summary judgment are felt to be paramount to any other issues pending in the case since it would be unrealistic to think that the expense of an accounting trial, pursuant to Rule 131(c), would want to be assumed while the issue of ownership raised by defendant's motion remains unresolved.

2. 534 F.2d 274, 209 Ct.Cl. 595 (1976).

age its property as a debtor-in-possession. Post-trial briefing by DCA of its cause of action before this court was repeatedly deferred because of the necessity of DCA to obtain the authorization of the bankruptcy judge to continue prosecution of the litigation. Following the approval of the bankruptcy judge, proposed findings of fact were finally submitted by DCA on April 10, 1974.

In the meantime, DCA, as the court-sanctioned debtor-in-possession, entered into an October 31, 1972 agreement with the Parker-West Corporation and its newly formed and wholly owned subsidiary, Rel-Reeves, Inc. The agreement, *inter alia*, called for the sale of all assets of DCA's Electronic Systems Division (hereinafter ESD), including the patent in suit and all claims thereunder, to Rel-Reeves. On December 4, 1972, Edward J. Ryan, Bankruptcy Judge of the United States District Court for the Southern District of New York, entered an order approving the agreement.

The agreement was amended seven times between the dates of October 31, 1972 and July 17, 1973 to revise the terms, date of closing, and numerous details of the sale. Each amendment provided that it was not to become effective until approved by order of the United States District Court for the Southern District of New York. Indeed, each amendment was approved by that court. For example, on June 20, 1973, Judge Ryan, in response to DCA's request of June 1, 1973 for an order—

> [A]uthorizing and empowering it to consummate an Amendment to an Agreement dated as at October 31, 1972, as amended by Orders of this Court made and entered on December 26, 1972, January 4, 1973, and by letter agreement dated January 5, 1973, with Parker-West Corporation for the sale of the assets of the Electronic Systems Division and the Esarbe Industries Division, * * *

ordered:

> The application of DYNAMICS CORPORATION OF AMERICA to consummate the Amended Agreement with Parker-West Corporation as modified upon the record of these proceedings with respect to the sale of the assets of the debtor's Electronic Systems Division, * * and in accordance with the Amended Agreement as modified dated May 14, 1973, entered into between the parties, be and the same is granted.

* * * * * *

> DYNAMICS CORPORATION OF AMERICA, as debtor and debtor-in-possession, be and it hereby is authorized and empowered to execute any and all instruments and other papers, and to take all of the steps which may be necessary or appropriate to effectuate the terms and intent of this order and the agreements referred to herein.

In addition, a July 19, 1973 order of the court authorized DCA to enter into the fourth, fifth, sixth, and seventh amendments to the October 31, 1972 agreement with Parker-West.

Under a bill of sale dated July 6, 1973, all of the assets of DCA's former Electronic Systems Division were transferred to Rel-Reeves, Inc. As part of the consideration for this transfer, DCA received $2,340,000 in cash and $11,422,000 in promissory notes of Parker-West, payable in yearly installments from 1973 to 1983.

In early 1974, disagreements among the parties arose, and on February 25, 1974, DCA obtained an order from the bankruptcy judge requiring Parker-West and Rel-Reeves to show cause why they should not be compelled to comply with the terms of the October 31, 1972 agreement. At about the same time, Parker-West and Rel-Reeves also commenced actions against DCA in the New York state courts. Shortly thereafter, the parties resolved their differences and entered into a settlement agreement dated March 15, 1974. Under the terms of this agreement, Parker-West was granted an option by DCA to purchase back its promissory notes, which at that time represented an unpaid principal of $10,422,400, for the discounted amount of $2,975,000, payable in cash, on or before September 30, 1974. Upon exercising the option, Parker-West

and Rel-Reeves, among other things, agreed to assign and transfer the subject litigation back to DCA. This agreement was explicitly made contingent upon the approval of the bankruptcy judge, and an order approving such agreement was issued by Judge Ryan on May 2, 1974.

In mid-September 1974, Parker-West and Rel-Reeves notified DCA that they would be unable to exercise the option on or before the prescribed date of September 30, 1974. The parties renegotiated the option agreement of March 15, 1974, and by an agreement dated September 25, 1974, amended the March agreement to extend the option date to February 15, 1975. In return for the extension of the option date, DCA was reassigned the subject patent litigation. The agreement of September 25, 1974 was approved by an October 30, 1974 order of Judge Ryan.

During the period July 6, 1973 to September 25, 1974, Rel-Reeves was the sole owner of the patent in suit and, as such, had the right to recover against the United States for all past infringement of the McCoy patent. Although the transfer of the subject litigation to Rel-Reeves took place on July 6, 1973, it was not until March 18, 1974 that a stipulation naming Rel-Reeves as plaintiff successor to DCA was submitted to defendant. The United States did not enter into this agreement until May 1975 and it was filed with the court on May 21, 1975, 3 weeks after the April 30 filing of my opinion on the question of liability. In this stipulation, the defendant consented to the substitution of Rel-Reeves as party plaintiff on the basis that the transfer of the assets of the Electronics Systems Division of DCA had been made pursuant to a judicial sale in bankruptcy. Defendant agrees that such a sale is a long-recognized exception to the Assignment of Claims Act.

During its brief period of ownership, Rel-Reeves pursued the instant case against the Government and was represented by the same attorney and firm of attorneys that represented DCA both prior to July 6, 1973 and after September 25, 1974. On August 31, 1973, Rel-Reeves agreed to settle a long-pending patent infringement suit involving the McCoy patent with Beckman Instrument Corporation.

By order of Judge Ryan, entered on November 27, 1974, DCA was discharged from Bankruptcy Proceeding No. 72–B–750 in the United States District Court for the Southern District of New York. Some 8 months later, and specifically on July 22, 1975, Rel-Reeves filed a Chapter XI petition in bankruptcy in the United States District Court for the Southern District of Florida, and is now an adjudicated bankrupt. In September of that year, the Defense Supply Agency, on behalf of the United States, filed the first of three proofs of claims against Rel-Reeves in the bankruptcy proceedings. Each claim sought to recover monies due the United States in connection with contracts between the Defense Supply Agency and Rel-Reeves. The proofs of claims filed by the Government all recite that there are no setoffs or counterclaims to the debts owed by Rel-Reeves.

*Issues*

The defendant argues that it is entitled to summary judgment against DCA because:

(1) DCA's right to recover is barred by the first paragraph of the Assignment of Claims Act, 31 U.S.C. § 203;[3] and

3. Rev.Stat. § 3477, as amended, 31 U.S.C. § 203 (1970), provides in pertinent part as follows:
  "All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, * * * shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. * * *
  "The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States * * * are assigned to a bank, trust company, or other financing institution, * * *."

(2) DCA is not the owner of the McCoy patent.

### Assignment Back to DCA is not Barred by Assignment of Claims Act

[1] Attention is initially turned to defendant's argument that DCA's right to recover is barred by the Assignment of Claims Act.[4] While defendant recognizes a few time-tested exceptions, it appears to be urging that the Act is to be applied literally, without regard to its intended purpose or the evils that the Act was attempting to discourage and curtail. Having carefully considered defendant's arguments and for reasons which follow, it is concluded that the assignment back to DCA does not violate the Assignment of Claims Act.

The origin of paragraph 1 of the present Act can be traced back to an 1846 statute.[5] As explained by this court in the case of *Patterson v. United States*, 354 F.2d 327, 329, 173 Ct.Cl. 819, 823 (1965):

Over the years * * * [the Act] has consistently been recognized by the courts to have two purposes—primarily, to prevent fraud; and secondarily, to avoid multiple litigation. More specifically, Congress is said to have had as its major objective the prohibiting of trafficking in claims against the Government such as by persons who would be in a position to exert political pressure or improper influence in prosecuting claims before the departments, the courts, or the legislature. * * * Secondarily, the courts have ascribed to Congress the motive of enabling the United States to deal exclusively with the original claimant instead of with several parties, thus obviating the necessity of having to inquire into the validity of specific transfers or assignments of the claim, minimizing subjection to successive litigation upon the same claim, and eliminating the risk of double payment or multiple liability. [Citations omitted.]

Defendant maintains that only a few judicially defined assignments are exempted from the Act. Thus, notwithstanding that they would literally come within the terms of the Act, defendant recognizes that:

(1) The "judicial sale" exception to the Act was created because of its apparent clash with the policy of the bankruptcy statutes, which is to facilitate the disposition of the bankrupt's estate through liquidation;[6] and,

(2) The exception in which a trustee in bankruptcy takes title to the property by operation of law because the bankruptcy statutes declare that legal title to certain property of the bankrupt vests in the trustee upon the filing of a petition in bankruptcy.[7]

---

4. Neither side has questioned the applicability of the Act to the assignment of a "claim" for which the Government has already been found judicially liable as is the case in this instance.

5. 9 Stat. 41.

6. *Western Pacific Railway Co. v. United States*, 268 U.S. 271, 45 S.Ct. 503, 69 L.Ed. 951 (1925).

7. *Erwin v. United States*, 97 U.S. 392, 24 L.Ed. 1065 (1878). *See also* the following analysis in *Patterson v. United States*, 354 F.2d 327, 329–30, 173 Ct.Cl. 819, 823–24 (1965):

"Although the statute was strictly construed for a period of time following its original enactment to invalidate virtually all assignments, the development of case law in succeeding years indicates a gradual broadening of the types of transfers excluded from the prohibitory mandate of the act. Thus, the courts have held the following assignments or transfers to be by 'operation of law,' and exempt from the relevant statutory provision: transfers by intestate succession or testamentary disposition, *Erwin v. United States*, 97 U.S. 392 [24 L.Ed. 1065] (1878); by consolidation or merger to the successor of a claimant corporation, *Seaboard Air Line Ry. v. United States*, [265 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149] *supra*; by judicial sale, *Western Pacific RR. Co. v. United States*, 268 U.S. 271 [, 45 S.Ct. 503, 69 L.Ed. 951] (1925); by subrogation to an insurer, *United States v. Aetna Casualty & Surety Co.*, [338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171] *supra*; by statutory provision to a trustee in bankruptcy, *McKay v. United States*, 27 Ct.Cl. 422 (1892), Accord, *Erwin v. United States, supra*; and by voluntary assignment of all the assets of an insolvent debtor for the benefit of creditors, *Goodman v. Niblack*, [102 U.S. 556, 26 L.Ed. 229] *supra*."

In substance, defendant appears to be arguing that only involuntary assignments are not proscribed by the Act. This approach favors form over substance and if adopted would mark a return to the mechanical application of the Act that was in vogue over 100 years ago. It also would sound a retreat from recent judicial interpretations of the Act which apply a more reasoned approach and necessarily consider the types of assignments which the Act sought to eliminate in reaching a decision regarding the validity of the assignment under scrutiny. The exact argument which defendant raises was rejected by Trial Judge Harkins in the case of *Foster v. United States*, Ct.Cl. No. 34–75 (Trial Judge's op. 1978), where, at p. 13, he pointed out:

> [T]he element of volition is not determinative of the type of transaction that is exempted from the act's design. Transfers by devise or inheritance and transfers to successor corporations, are voluntary assignments. They are beyond the scope and are exempt because they do not threaten the transfers sought to be avoided by the act. [Citations omitted.]

Defendant's arguments also fail for the more fundamental reason that they do not take into consideration the long and protracted negotiations surrounding the sale of the assets of the Electronic Systems Division of DCA to Rel-Reeves. Particularly, defendant's arguments are deficient because the facts demonstrate that the transfer of the patent in suit and the claim against defendant to Rel-Reeves, and the subsequent transfer back to DCA of the same patent and claim were one continuous judicially supervised transaction, and were not independent and unrelated assignments.

This court has recently had the opportunity to examine the judicially created exceptions to the Act in the case of *Keydata Corp. v. United States*, 504 F.2d 1115, 205 Ct.Cl. 467 (1974). *Keydata* underscores the reasoned approach favored by this court in interpreting the Act. This court repeatedly stressed, in the following exemplary language which appears at page 473, 504 F.2d at page 1118, the necessity of interpreting the Act with an eye towards the types of assignments that the Act sought to avoid:

> Despite the broad language of the Act, and the courts' tendency at an earlier time to read it as an all-inclusive prohibition, numerous classes of assignments, although literally within the statutory ambit, have been judicially exempted from its operation. The largest category of excised assignments are those which, in one form or another, occur by operation of law. Various such assignments which are regularly held to be unaffected by the Act include the passage of claims to heirs and devisees, transfers made incident to proceedings in bankruptcy or receivership, transfers by the succession of one business entity for another, assignments made by judicial sale or order, and assignments produced by operation of the law of subrogation. *These classes of assignments are all thought to be outside the statute's scope because none of them threatens the dangers Congress sought to avoid by enacting the prohibition.* [Citations omitted and emphasis added.]

While defendant concedes that the transfer of the patent suit from DCA to Rel-Reeves in July 1973 falls within one of the above-discussed judicially created exceptions to the Act, it argues that the transfer by Rel-Reeves back to DCA in September 1974 was an assignment made in settlement of private litigation and was entirely voluntary on the part of Rel-Reeves. The defendant asserts, without any positive factual support, that the parties could have chosen any means they desired to settle their lawsuit, but chose to use the patent infringement claim.

Defendant thus argues that Rel-Reeves' claim against the Government was used as an asset to settle the differences which had arisen between Rel-Reeves and DCA, and that the assignment by Rel-Reeves of the subject litigation amounted to a blatant "trafficking in claims" which is prohibited by the Anti-Assignment Act.

Defendant further contends that the mere presence of a referee in bankruptcy

on one side of the transaction did not mean that an assignment occurs by operation of law. Defendant maintains that Rel-Reeves was not under a court order to make the assignment, and that the referee for DCA had no power to compel Rel-Reeves to do so.

As previously pointed out, the original October 31, 1972 agreement between DCA and Rel-Reeves was entered into following DCA's management of the property as a debtor-in-possession. The agreement was judicially sanctioned on December 4, 1972 by Bankruptcy Judge Ryan. However, instead of an immediate consummation of the sale, the facts show that no less than seven amendments were made to the original agreement between the dates of October 31, 1972 and July 17, 1973. Each of the amendments was presented to Judge Ryan, and orders approving them were issued.

Finally, pursuant to a July 6, 1973 bill of sale, all of the assets of DCA's Electronic Systems Division, including the McCoy patent and the subject litigation, were transferred to Parker-West and Rel-Reeves for $2,340,000 in cash and $11,422,000 in notes, payable in yearly installments from 1973 to 1983.

Unfortunately, the dealings between DCA on one hand and Parker-West and Rel-Reeves on the other hand did not end with the July 6 bill of sale, for disagreements among the parties in early 1974 culminated in, at DCA's request, an order being issued by Judge Ryan requiring Parker-West and Rel-Reeves to show cause why they should not be compelled to comply with the terms of the October 31, 1972 agreement, as amended. At the same time, Parker-West and Rel-Reeves had commenced actions against DCA in the New York state court. In order to resolve their differences, the parties entered into the March 15, 1974 agreement.

It should be emphasized that at this point in time, except for the prepayment of the December 1, 1973 $1,000,000 note, $10,422,-400 was still owed to DCA in a series of notes which were payable between the years 1974 and December 1, 1983. The March 15, 1974 agreement, among other things, granted Parker-West an option, which was exercisable prior to September 30, 1974, to purchase the $10,422,400 unpaid principal amount of the promissory notes at an option price of $2,975,000. In turn, upon exercising its option, Parker-West agreed, among other things, to—

[E]xecute any and all documents necessary in order to assign, transfer and convey to DCA all of their right, title and interest in and to a certain patent infringement litigation in the United States Court of Claims designated as Rel-Reeves against the United States Government; * * *.

That the March 15, 1974 agreement was a further effort by the parties to clarify and complete their October 31, 1972 agreement is clear from the following, which is part of the March 15, 1974 agreement:

C. Upon the exercise of the Option, the Acquisition Agreement [agreement of October 31, 1972] shall continue in full force and effect, except to the extent specifically waived or modified by (1) the provisions of this agreement, * * *. The parties agree that the general releases contemplated herein will recognize those obligations under the Acquisition Agreement [agreement of October· 31, 1972] which should and will thus continue and that neither party will be released therefrom except by performance.

FIFTH: *Expiration of the Option.* In the event that the Option shall expire without being exercised, the rights and obligations of the parties hereto under the Acquisition Agreement shall continue in full force and effect except to the extent specifically waived or modified by the provisions of this Agreement.

The continuing role which Judge Ryan played in management of DCA's affairs was recognized by the parties, for the March 15, 1974 agreement provided:

FIRST: *Approvals.* A. This Agreement is subject to the approval of each of (1) the Board of Directors of DCA, (2) the Official Creditors' Committee * * * acting under the Arrangement Proceed-

ings and (3) *the Judge in the Arrangement Proceedings.*

\* \* \* \* \* \* \* .

SIXTH: *Binding Nature of Agreement. Upon the approval of this Agreement by* the Board of Directors of DCA, the Creditors Committee *and the Judge in the Arrangement Proceedings, this Agreement shall be binding upon DCA* \* \* \*. [Emphasis added.]

Judge Ryan, on May 2, 1974, ordered: [T]hat DYNAMICS CORPORATION OF AMERICA be and hereby is authorized and empowered to grant to Parker West Corporation an option exercisable at any time prior to September 30, 1974 for Parker West Corporation to purchase the promissory notes issued by it to DYNAMICS CORPORATION OF AMERICA, pursuant to the provisions of the agreement of October 31, 1972 as thereafter amended, representing the unpaid principal amount of $10,422,400 for the sum of $2,975,000 *and for such other consideration as is more particularly set forth in the agreement* as entered into between the parties on March 15, 1974 [which included the reassignment of the subject litigation] \* \* \*.

\* \* \* \* \* \*

[T]hat DYNAMICS CORPORATION OF AMERICA, debtor and debtor-in-possession be and it hereby is authorized and empowered to execute any and all documents and do all things necessary to effectuate the intent and purpose hereof. [Emphasis added.]

As the September 30, 1974 expiration date for exercising the option approached, Parker-West and DCA agreed to an extension of the option exercise date. A September 25, 1974 agreement amending the March 15 option agreement provides in relevant part:

In consideration for the extension of the Option [to February 15, 1975] Parker-West and Rel-Reeves hereby agree that \* \* \* all right, title and interest in and to a certain patent infringement litigation in the United States Court of

Claims designated as Rel-Reeves against the United States Government is hereby assigned, transferred and conveyed to DCA effective the date of this Agreement. Parker-West and Rel-Reeves shall execute any and all documents necessary in order to assign said claim \* \* \*.

Judge Ryan, on October 30, 1974, ordered that DCA, the debtor and debtor-in-possession—

[B]e and it hereby is authorized and empowered to enter into an amendment of the Agreement as entered into by it with Parker-West and Rel-Reeves on March 15, 1974, as more specifically set forth in the Agreement as entered into between the parties on September 25, 1974 \* \*.

ORDERED that the authorization hereinabove granted be *nunc pro tunc* as at September 25, 1974; and it is further

ORDERED that DYNAMICS CORPORATION OF AMERICA, debtor and debtor-in-possession herein, be and it hereby is authorized and empowered to execute any and all documents and do all things necessary to effectuate the intent and purposes hereof.

It is thus seen that the September 25, 1974 agreement which transferred the lawsuit back to DCA was not only another of the series of modifications to the original October 31, 1972 agreement between Parker-West and DCA, but was conditioned upon the approval of the bankruptcy judge. Indeed, the facts clearly show an ongoing attempt, beginning with the October 31, 1972 agreement, by DCA, Rel-Reeves, Parker-West, and Judge Ryan to strike a bargain that would not only be acceptable to all the parties, but at the same time would also achieve the goals of the Chapter XI arrangement.

Accordingly, defendant's argument that the original transfer from DCA to Rel-Reeves avoided the Act because it was judicially compelled, but that the transfer back from Rel-Reeves to DCA is barred since it was voluntarily made, is unsupported by the facts. In point of fact, the court ordered and authorized both assignments.

Thus, to the extent that the original assignment by DCA was "judicially compelled," so also was the assignment back by Rel-Reeves to DCA "judicially compelled."

Not only is the assignment from Rel-Reeves to DCA found to come within the "court-sanctioned" exception to the Assignment of Claims Act, but it is also clearly found to violate none of the legislative objectives of that Act.

One of the purposes behind the Act was the desire of Congress to have the United States deal exclusively with the original claimant. Congress felt that preventing the assignment of a claim against the Government would obviate the necessity of inquiring into special transfers or assignments of the claim.[8] However, if anything, the allowance of the assignment back to DCA in this instance will better serve the legislative purpose of Congress than will its denial. Specifically, by allowing the assignment in this instance, DCA, the claimant who originally obtained a liability judgment against the Government, would once again be prosecuting its claim in this court. Moreover, there is no need to inquire into the transfers between the parties since they were all judicially supervised. In addition, by allowing the transfer back to DCA, the Government will only have to deal with one claimant, rather than the possible multiple parties defendant foresees emerging from the assignees of Rel-Reeves.[9]

Defendant has also argued that the assignment from Rel-Reeves back to DCA is violative of the Anti-Assignment Act because it cuts off a claim of the Government against Rel-Reeves. The Government correctly points out that this was one of the inequities which the Assignment of Claims Act sought to prevent. In support of its position, defendant relies on *Beaconwear Clothing Co. v. United States*, 355 F.2d 583, 174 Ct.Cl. 40 (1966). Beaconwear, a clothing contractor, entered into the first of two contracts to produce military coats for the

Government on May 20, 1953. During the course of performance of this contract, Beaconwear requested, and the Government agreed to, 10 variations in the performance of the contract. The evidence before the court indicated that as a result of the variations, the parties not only agreed to a reduction in the contract price, but also agreed on the amount of the reduction. Agreements between the Government and Beaconwear, reflecting the reduction, were executed on September 18, 1953 and March 2, 1954.

On May 29, 1953, Beaconwear entered into the second contract with the Government which it subcontracted to a third party. Beaconwear, in addition, made two assignments of its right to receive payment under this second contract to third parties. The first assignment occurred on November 21, 1953, when Beaconwear assigned its rights to the Amalgamated Bank of New York. The second assignment occurred on January 18, 1954, when Beaconwear assigned all of its rights to three individuals.

The court held the November 21, 1953 assignment to be valid under the second paragraph of the Assignment Act, which is not at issue in the case at bar and sanctions the assignment of a claim to a bank in certain specified instances. The January 18, 1954 assignment was, however, held to be void as against the Government under the first paragraph of the Act, as a voluntary transfer which violated one of the purposes of the Act. Beaconwear was concerned that claims that the Government has against an assignor by way of setoff or counterclaim would be cut off and unavailable against an assignee, if the assignment of Government claims were freely permitted.

Defendant argues that *Beaconwear* requires the voiding of the assignment by Rel-Reeves back to DCA since the assignment cuts off defendant's claims against Rel-Reeves.

---

**8.** *Patterson v. United States*, 354 F.2d 327, 329, 173 Ct.Cl. 819, 823 (1965).

**9.** There has been no showing by defendant that the assignment amounts to trafficking in

claims, a transfer to a person who would be in a position to exert political pressure or improper influence in prosecuting claims before federal courts, departments or the legislature.

While no one quarrels with the principle enunciated in *Beaconwear*, it is critical to keep in mind the facts which were found to be controlling by the court in reaching its opinion. In *Beaconwear*, both the assignor and the Government agreed, prior to the January 18, 1954 assignment, to a reduction in the contract price. The reduction of the contract price, which was the basis for the Government's counterclaim, resulted from the assignor's request for a variation in the contract performance. Thus, prior to the January 18, 1954 assignment of the May 29 contract, the Government's right to receive a sum of money in return for the variation in performance by Beaconwear had at least partly accrued.

By agreeing that it owed a refund to the Government, Beaconwear was legally bound to repay that sum and the court correctly concluded that it should not be permitted to transfer a claim against the Government to a third party against whom the Government could not set off Beaconwear's admitted obligation.

The above compelling circumstances are not present in the case at bar. The Government's claim against Rel-Reeves did not result from an express agreement between the parties that Rel-Reeves owed them a sum of money, but rather from claims filed by an instrumentality of the Government, the Defense Supply Agency, against Rel-Reeves on September 4, 1975, June 1, 1976 and September 23, 1976.[10] Thus, the earliest of defendant's claims was not filed until approximately 1 year after Rel-Reeves transferred the suit back to DCA. Moreover, at the time the Government filed its

proofs of claims, Rel-Reeves was already involved in bankruptcy proceedings. These facts are clearly distinguishable from those which existed before the court in *Beaconwear*.

If the court had allowed the January 18, 1954 assignment by Beaconwear to stand, the Government would have lost claims which accrued against Beaconwear *prior* to the January 18, 1954 assignment. In such compelling circumstances, it is no wonder that the court felt constrained to void the assignment. However, at the time of Rel-Reeves' assignment back to DCA, the Government does not appear to have had any accrued claims against Rel-Reeves. Thus, to allow the assignment by Rel-Reeves back to DCA would not deprive the Government of any claims it had against Rel-Reeves prior to the assignment. Under these facts, since the Government has not lost any right to recover against Rel-Reeves that it had prior to the assignment back, I decline to void the assignment back to DCA.

### DCA is the Owner of the Patent in Suit

In addition to contending that DCA lacks a valid and enforceable right to recover against the Government because the September 25, 1974 assignment from Rel-Reeves violated the Assignment of Claims Act, defendant also argues that DCA lacks title to the patent in suit and is not the real party in interest.

It is elementary that the owner of a patent must be the one who brings suit to recover for its infringement.[11] At the time

---

**10.** In addition, *Beaconwear Clothing Co. v. United States*, 355 F.2d 583, 174 Ct.Cl. 40 (1966), is distinguishable from the case at bar since Rel-Reeves had not agreed that it owed a liquidated sum to defendant before the reassignment of the patent litigation to DCA.

**11.** *See Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 40–41, 43 S.Ct. 254, 258, 67 L.Ed. 516 (1923), where the Supreme Court stated:

"The law as to who should bring a suit at law for damages by infringement of a patent is clearly and correctly stated in Robinson on Patents, § 937, as follows:

" 'With a single exception the plaintiff in an action at law must be the person or persons in whom the legal title to the patent resided at the time of the infringement. An infringement is an invasion of the monopoly created by the patent, and the law which defines and authorizes this monopoly confers only upon its legal owners the right to institute proceedings for its violation. These owners are the patentee, his assignee, his grantee, or his personal representatives; and none but these are able to maintain an action for infringement in a court of law. * * ' "

of the liability trial, the ownership of the patent by DCA is not contested. Nor is it contested that the assignment of July 6, 1973 vested ownership of the patent in Rel-Reeves. However, defendant argues that the September 25, 1974 agreement in which Parker-West and Rel-Reeves agreed, as consideration for DCA's extension of the option cutoff date from September 30, 1974 to February 15, 1975 to transfer and assign the patent litigation to DCA, did not transfer title to the McCoy patent back to DCA. A review of the documents attached by defendant and DCA to their summary judgment papers clearly demonstrates the intent of Rel-Reeves to transfer title of the McCoy patent back to DCA.

■ Perhaps the best evidence of the parties' intention to transfer the title to the McCoy patent to DCA is evidenced from the fact that DCA appears as the owner in the assignment records of the Patent and Trademark Office. Further evidence of ownership can be inferred from the failure of the trustee in bankruptcy of Rel-Reeves to respond to this court's Rule 41 notice.

Moreover, even defendant believes that the September 25, 1974 language of the assignment was effective to transfer the patent suit back to DCA. In transferring back to DCA all of Rel-Reeves "right, title and interest" in the patent suit, the parties must have contemplated and intended to transfer Rel-Reeves' right to bring and maintain the subject cause of action back to DCA. The right of DCA to maintain or bring the subject patent suit necessarily means, as *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 40–41, 43 S.Ct. 254 (1923), clearly teaches, that title to the McCoy patent was transferred from Rel-Reeves to DCA. Since the intent of the parties is clear, it serves no useful purpose to require, as defendant insists,

that the September 25, 1974 agreement also provide that title to the patent was being transferred from Rel-Reeves to DCA.[12]

I accordingly must conclude under the facts and circumstances of this case, that DCA is the legal titleholder of the McCoy patent in suit.

Finally, allowance of the assignment also will overcome difficulties in resolving the real party in interest issue raised by defendant. *See Scanwell Laboratories, Inc. v. Thomas*, 172 U.S.App.D.C. 281, 521 F.2d 941 (1975), cert. denied, 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976). In *Scanwell*, plaintiff, a bankrupt, assigned its claims against the Government to its counsel. The Government argued that this was in violation of the Act, and that therefore there was no real party in interest who was eligible to pursue the claim. With the approval of the bankruptcy judge, Scanwell's counsel transferred the claim back to plaintiff. Judge Oscar Davis, of this court sitting by designation concluded:

This [the transfer back] satisfied the requirement that the real party in interest be identified as well as the rule of the Assignment of Claims Act, since the purposes of that statute—that the United States be able to deal with one claimant only, and that there be no trafficking in claims against the Government, see *Patterson, supra*, at 822–23, [354 F.2d 327],— have been served by the retransfer to the original claimant.[13]

Similarly, the transfer back to DCA of the lawsuit it originally brought and prosecuted to judgment, perpetuates the principles of the Act.

CONCLUSION

Since it is found the September 25, 1974 assignment by Rel-Reeves to DCA to be

12. This view is further reinforced by events which have occurred since the September 25, 1974 agreement. Specifically, although Douglass E. Wendel, trustee to Rel-Reeves, on January 7, 1976 transferred whatever title Rel-Reeves had to a number of patents, including the McCoy patent, to International Technical Products Florida Corporation, the record demonstrates that International Technical Products has acknowledged that title to the McCoy patent resides in DCA.

13. *Scanwell Laboratories, Inc. v. Thomas*, 172 U.S.App.D.C. 281, 521 F.2d 941, 944, n. 3 (1975), cert. denied, 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976).

valid against the Government notwithstanding the Assignment of Claims Act, and since it is also found that DCA is the owner of the patent in suit, defendant's motion for summary judgment is denied, and plaintiff's cross-motion under Rule 66(c) is granted.

NICHOLS, Judge, dissenting:

Respectfully, I dissent. Counsel admitted the case was one of first impression. I do not think the facts are appropriate for a new judge-made exception to the Assignment of Claims Act, 31 U.S.C. § 203. Defendant was asked to consent and consented to the assignment by DCA to Rel-Reeves. Defendant has a legitimate interest in having its consent likewise asked for return of the claim to DCA. It fears it will lose the benefit of offsets maintainable against Rel-Reeves. The return to DCA cannot legitimately be regarded as involuntary or by operation of law.